Case: 1:26-mj-00084
Assigned To: Judge Faruqui, Zia M.
Assign. Date: 5/8/2026
Description: COMPLAINT W/ARREST WARRANT

**AFFIDAVIT IN SUPPORT OF**
**A CRIMINAL COMPLAINT AND ARREST WARRANTS**

I, Derek Candela, being duly sworn, depose and state the following:

**INTRODUCTION AND AGENT BACKGROUND**

1. This affidavit is submitted in support of a criminal complaint and an arrest warrant charging that, from at least September 3, 2023 and continuing through at least April 20, 2024, within the District of Columbia and elsewhere, the defendant, MWASI SONGAMBELE, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the control of, the D.C. Medicaid program, a health care benefit program, as defined in 18 U.S.C. § 24(b), in connection with the delivery of and payment for health care benefits, items, and services, namely Community Support Worker services and Mental Health Rehabilitative Services, all in violation of 18 U.S.C. § 1347.

2. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since July 2022. I am currently assigned to the Washington Field Office and specialize in investigating health care fraud, since 2022. Prior to being hired as a Special Agent with the FBI, I was a practicing attorney since 2011, approximately seven years of which I was a state criminal prosecutor. I have experience investigating various types of crime, and I have investigated or assisted in the investigation of numerous cases involving white-collar crime. I have been a sworn law enforcement officer during all times herein.

3. During my time in law enforcement, I have participated in the application and execution of numerous arrest and search warrants related to the investigation of white-collar crime and related offenses. These investigations have resulted in the prosecution and conviction of numerous individuals and other investigatory matters. Additionally, I have interviewed many

individuals involved in white-collar crime and obtained information from them regarding the means and methods used to commit health care fraud.

4. Based on my training and experience relating to the investigation of health care fraud, and, based on interviews I have conducted with other officers, defendants, informants, witnesses, and participants involved in said activities, I am familiar with the ways that white-collar criminals conduct their business.

5. The statements in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers, witnesses, and other sources of information obtained and reviewed during the investigation. This affidavit is intended to show merely that there is sufficient probable cause of the requested warrants and does not set forth all my knowledge about this matter. The inferences and conclusions I draw from the evidence included in this affidavit are what I believe based on my training, experience, and knowledge of the investigation.

## PROBABLE CAUSE

### Background on the Medicaid Program

6. Medicaid is a medical assistance program established by Congress under Title XIX of the Social Security Act of 1965 (the "Medicaid Act"). Medicaid is overseen and administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency within the United States Department of Health and Human Services ("HHS") and provides medical insurance coverage primarily to individuals whose incomes fall below a certain financial threshold as measured against the poverty line. Under the Medicaid Act, each state, and the District of Columbia, is required to promulgate and administer its own plan for medical assistance in accordance with federally established minimum requirements. In the District of Columbia, the Medicaid program is

administered by the District of Columbia's Department of Health Care Finance ("DHCF"), located at 441 4th Street, NW, Washington, D.C. Medicaid is jointly funded by the federal government and the District of Columbia, with the federal government paying approximately 70% of the costs of the Medicaid program.

7. The term "health care benefit program" is defined in 18 U.S.C. § 24(b) as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract" and includes the D.C. Medicaid program. 18 U.S.C. § 24(b). Medicaid operates as a vendor payment program, with payments made directly to the providers.

8. Low-income families, children, and disabled adults who meet certain eligibility requirement, such as income and asset criteria, are eligible for Medicaid in the District of Columbia. Individuals who receive benefits under Medicaid are referred to as Medicaid "recipients."

9. Healthcare providers seeking to provide services to recipients must apply for and obtain a provider number. Once issued a provider number, a healthcare provider may file claims to obtain reimbursement for services provided on behalf of recipients. Such claims are required to set forth, among other information, the recipient's name, the Medicaid identification number, the services that were performed for the recipient, the date the services were performed, and the cost

of the services. Payments for services are generally made directly to the provider based on the provider's submitted claims.

**Background on Company A**

10. Company A, National Provider Identifier ("NPI") x4776, is a company that provides mental health rehabilitation services, sometimes referred to as "MHRS," to youth and adolescents in the District of Columbia.

11. Company A was originally issued a Certificate of Organization by the District of Columbia Department of Consumer and Regulatory Affairs Corporations Division on March 2, 2017, under a slightly different trade name.

12. In mid-to-late 2020, Company A switched from providing home health care services to adolescent mental health rehabilitative services. Company A applied to the District of Columbia Department of Behavioral Health ("DBH") to provide Medicaid beneficiaries child and adolescent psychiatry and neurology services, with a requested effective date of June 9, 2020. In Washington, D.C., behavioral health services were administered by DBH. As the primary mental health authority in D.C., DBH was responsible for implementing and overseeing D.C.'s MHRS program, a program covered by Medicaid. On October 22, 2020, Company A was approved to provide MHRS to youth in the District of Columbia as a "Core Services Agency," or a local authority responsible for planning, managing, and monitoring public mental health services within the District of Columbia. The services that Company A was authorized to provide included Diagnostic/Assessment; Medication/Somatic Treatment, Counseling and Psychotherapy, and

Community Support, in accordance with Chapter 34 of Title 22 of the District of Columbia Code of Municipal Regulations.

13. On September 14, 2020, Company A entered into a Service Agreement with the District of Columbia Department of Health Care Finance for the purpose of billing for Medicaid services, with a revalidation date of September 14, 2025. The service agreement between Company A and the District of Columbia was for Mental Health Clinic Services, Psychiatric Services, and Medicare Part B Services. The listed Primary Taxonomy Name on the Agreement was Community/Behavioral Health and Psychiatry & Neurology Child & Adolescent Psychiatry. The Authorization for Vendor Payments from DHCF for Medicaid payments to Company A was signed by Person A on July 13, 2020. The practice location was listed as 1818 New York Ave, Suite 222, Washington, D.C. 20002. The listed owner primary contact on the agreement was Person B, with a listed address in Maryland and phone number xxx-xxx-4269, and email [REDACTED PERSONAL]@gmail.com. In the Provider Identifiers Information section of the agreement, the listed Provider email address is [REDACTED COMPANY]@gmail.com.

14. One of the services that Company A has been providing its clients since late 2020 is Community Support Worker ("CSW") services. Typical CSW services involve assisting clients with daily tasks, listening to concerns, assisting with medications, case management, and connecting clients with community services. CSWs do not need a certification or specific qualifications beyond a high school degree to be hired or to provide CSW services. CSWs are not qualified to perform certain services, such as providing counseling sessions, formulating patient

treatment plans, and conducting diagnostic assessments of patients, unless they also meet certain licensing requirements.

15. As a Core Services Agency ("CSA") in D.C., Company A is required under DBH policy to maintain up-to-date records and to accurately document all MHRS encounters billed under the CSA's electronic medical records (EMR) system. Encounters with patients are billed as "units" and one unit is equivalent to 15 minutes of time spent providing service to a patient. Medicaid authorized service encounters exceeding seven minutes to be rounded to the nearest whole unit. Per DBH regulation, a CSW is required to document each encounter in a CSA's EMR system, which is then reviewed, approved, and sent to DBH for reimbursement.

16. The EMR system utilized by Company A is an online platform called "Credible." Credible is accessed by all workers and managed by those with administrative accounts. To be reimbursed by Medicaid for MHRS services provided to consumers, CSWs are required to document the services in Credible by inputting clinical encounter notes that include, among other information, consumer information, treatment notes, and dates and times of service. CSWs are authorized to conduct encounters in several ways, including by telephone. CSWs are required to validate the accuracy and authenticity of the services by signing their names. DBH regulations

required the actual start and stop time of MHRS encounters to be used to calculate the duration of the service.

17. Once a CSW submits an encounter note for reimbursement, the CSA is required to review the notes for accuracy and approval prior to submission to Medicaid for reimbursement.

18. Company A , as well as employees of Company A , including CSWs, are required to know, understand, and follow all federal and local laws, including Medicaid rules and regulations applicable in Washington D.C.

**Mwasi Songambele's Role at Company A**

19. MWASI SONGAMBELE, based upon information and belief gathered in the course of this investigation, has been shown to be one of the controlling executives of Company A. Songambele was listed as "Governor" on Company A 's original Certificate of Organization. A series of employees or related associates of Company A reported that Songambele controlled day-to-day operations at Company A , or was considered an owner. In her interview with the FBI, Songambele also provided that she was an owner and operator of Company A. She further provided that she had a role as "Care coordinator" and supervisor at Company A. Songambele provided she never did "clinical" work, but did do CSW services. Songambele acknowledged that CSWs were to bill for the time they actually worked, and their service must be noted in the Credible record system. Songambele never shared her password in Credible with anyone. Also, all services provided by her were done via telehealth or in-person versus over a video conferencing system. As part of her registration with DC DBH, Songambele signed a security document. In that

document, she agreed not to share her Credible password or username with anyone.

**Mwasi Songambele Submitted False Information**
**Causing Services To Be Billed That Were Not Rendered**

20. As part of its investigation, law enforcement reviewed Credible records submitted under the username "Mwasi Songambele, BS." One of the consumers which she submitted encounter notes for was A.P., a juvenile male with a date of birth of [redacted]. From September 2, 2023 to March 6, 2024, law enforcement identified 80 telehealth CSW encounters notes entered by this user for a total of 4,702 minutes in duration.

21. Law enforcement interviewed A.P.'s mother, also A.P., and grandmother, S.P. A.P.'s mother and grandmother provided that, during the above-noted timeframe, and when shown the amount of billing submitted under said username, the amount of billing must have been false. They provided that A.P. likely did not spend more than four to five minutes on a call with Company A employees, and that Company A employees only called 2-3 times per month.

22. A.P.'s mother and grandmother provided that the only telephone numbers Songambele and Company A would have called to provide services were those of the family: *1760; *9519; and *9046.

23. Through legal process and information provided by witnesses and Company A employees, to include Songambele herself, law enforcement identified Songambele's personal cellular telephone number as *8902. Telephone number *8687 was identified as a Company A's office telephone, registered to Songambele and likely used by her and other Company A employees.

24. A review of telephone records associated with *8687 and *8902 showed that from September 2, 2023, to March 6, 2024, there were only sixteen instances of connectivity between

*8687 and *1760 for a total of 11 minutes and 36 seconds.

25. Law enforcement also reviewed a sample of Credible encounter notes submitted under the "Mwasi Songambele, BS" username for telehealth services provided to A.P. during the period of April 7, 2024, through April 20, 2024. During this period, the Songambele username claimed to provide 336 minutes of telehealth services to A.P. A review of the *8687 and *8902 telephone records associated with Songambele showed that only two calls were made to either A.P., A.P.'s mother, or A.P.'s grandmother during this span: one for five seconds from *8687 on April 18, 2024, and one for 177 seconds from *1760 on the same date. The Table below shows the purported claims for service entered by username Mwasi Songambele, the duration that was listed for each telehealth call, and indicates whether the corresponding telephone records showed connectivity as submitted in the encounter note:

| Credible ID | Employee | Type | Status | Date | Call Start | Call End | Duration (min) | Call Made as Submitted |
|---|---|---|---|---|---|---|---|---|
| 106151 | Mwasi Songambele | CommSupt | Paid | 4/7/24 | 12:00 PM | 1:00 PM | 60 | No |
| 10652 | Mwasi Songambele | CommSupt | Paid | 4/10/24 | 5:00 PM | 5:55 PM | 55 | No |
| 106153 | Mwasi Songambele | CommSupt | Paid | 4/13/24 | 12:05 PM | 1:00 PM | 55 | No |
| 106157 | Mwasi Songambele | CommSupt | Paid | 4/16/24 | 5:03 PM | 6:00 PM | 57 | No |
| 106158 | Mwasi Songambele | CommSupt | Paid | 4/18/24 | 5:30 PM | 6:24 PM | 54 | No |
| 106708 | Mwasi Songambele | CommSupt | Paid | 4/20/24 | 12:05 PM | 1:00 PM | 55 | No |

For each purported community support service listed in the above Table, Songambele wrote in the encounter note that she called A.P. at the number ending in *9519. Each note was then digitally signed by Songambele and then submitted to D.C. Medicaid for reimbursement.

26. Based on the foregoing facts, I believe probable cause exists to support the issuance of a Criminal Complaint charging SONGAMBELE with violations of 18 U.S.C. § 1347.

Respectfully submitted,

Derek Candela
Special Agent
Federal Bureau of Investigation

Attested to in accordance with the requirements of Fed. R. Crim. P. 4.1 via telephone on May 8, 2026:

Hon. Zia M. Faruqui
United States Magistrate Judge
District of Columbia